AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

_____ District of _____



**FILED**

2/24/2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. |
| | ) |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Shanna Saunders*

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to before me by telephone.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR LOCATION INFORMATION PERTAINING TO A GREEN 2019 DODGE CHALLENGER WITH VIN 2C3CDZFJ6KH649648 AND/OR IMSI 310170825118863 AND/OR MSISDN 521-757-4569 AND/OR IMEI 01517000079155346, ASSOCIATED WITH SIRIUS XM | Case Number: 23 M 205<br><br>Hon. Gabriel A. Fuentes<br>Magistrate Judge<br><br>**UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Shanna K. Saunders, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for vehicle location information for a green 2019 Dodge Challenger with Vehicle Identification Number ("VIN") 2C3CDZFJ6KH649648 and/or International Mobile Subscriber Identity ("IMSI") 310170825118863 (the "**Subject Vehicle**"), whose telematics[1] service provider is Sirius XM Radio, Inc. ("Sirius XM"), headquartered at 1221 Avenue of the Americas, New York, New York. The telematics system for the **Subject Vehicle** has wireless technology service provided by AT&T, a wireless

---

[1] Telematics is "the combination of information technology with telecommunications, especially the integration of telecommunications networks in vehicles (as for collecting data on performance)." Merriam-Webster Dictionary. *Accessed January 10, 2022.*

telephone service provider headquartered at North Palm Beach, Florida ("PROVIDER"). The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.    I am a Special Agent with the Federal Bureau of Investigation and have been since approximately September 2017. My current responsibilities include the investigation of violent crimes, including, among others, kidnapping, bank robbery, and the apprehension of violent fugitives. I have been involved in multiple search warrants to include warrants for phone and service provider data.

3.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2113(a), bank robbery; and 18 U.S.C. § 1951, Hobbs Act robbery (the "**Subject Offenses**"), have occurred. There is also probable

cause to search the information described in Attachment A for evidence of the **Subject Offenses** as further described in Attachment B.

## PROBABLE CAUSE

### *Background on Prior Warrants*

1.      The FBI is investigating three attempted or completed bank robberies which occurred in the Chicago metropolitan area on January 4, 2021. The banks that were robbed were the (1) PNC Bank located at 2810 South Highland, Lombard, Illinois; (2) Byline Bank located at 3245 Lake Avenue, Wilmette, Illinois; and (3) Fifth Third Bank located at 1311 Ridgeland Avenue, Naperville, Illinois.

2.      Law enforcement believes the robberies are related and were committed by the same individuals based on: (i) the same date and similar locations of the robberies, (ii) the common modus operandi used in each robbery (*i.e.*, similar verbiage in the demand notes), (iii) the similar physical appearance and clothing of the robbers at all three locations, and (iv) the matching descriptions of the getaway vehicle.

3.      I believe that the unknown subjects who robbed the banks used a stolen car (the **Subject Vehicle**), as a getaway car. Therefore, location information related to the **Subject Vehicle**'s internal telematics system will further the investigation by allowing law enforcement to track the vehicle's movement and location in the days leading up to and the day of the bank robberies, January 4, 2021, until law enforcement recovered the **Subject Vehicle** on January 8, 2021.

3

4.     On or about March 5, 2021, the government submitted an affidavit in support of an application for historical cell site information for the telematics system inside the **Subject Vehicle** (the "March 5, 2021 Affidavit"). The March 5, 2021 Affidavit identified the telematics system whose location information the warrant application sought by an IMEI number, 0151700079155346. The IMEI was identified as being related to the **Subject Vehicle** by Fiat Chrysler Automotives, the manufacturer of the **Subject Vehicle**. (At the time, AT&T could not search for historical cellular location information for a vehicle's telematics system based on the vehicle's VIN.)

5.     On or about March 5, 2021, Acting Chief Judge John J. Tharp, Jr. granted the application and issued the search warrant (the "March 5, 2021 Warrant and Order").[2] The March 5, 2021 Affidavit and March 5, 2021 Warrant and Order are incorporated herein by reference and can be made available to the Court upon its request.

6.     Law enforcement served the March 5, 2021 Warrant and Order on AT&T on or about March 5, 2021. When law enforcement received the response from AT&T, the records appeared to show that the signal was coming from California, and AT&T could not provide a confidence radius for the signal. The records law enforcement received from AT&T conflicted with known information about the

---

[2] The government's March 5, 2021 application for search warrant in this matter pre-dated the current scheme under which search warrants for historical cell site information are designated with "M" numbers.

**Subject Vehicle**'s location, leading to law enforcement to conclude that the records received from AT&T were not accurate.

7.    In August 2022, I communicated with representatives from AT&T who explained that AT&T now had the ability to search for and obtain historical cellular location information for a vehicle's telematics system based on the vehicle's VIN. On or about August 24, 2022, law enforcement served a subpoena on AT&T for records regarding the **Subject Vehicle** with VIN 2C3CDZFJ6KH649648 for time period December 25, 2020, through January 16, 2021. According to AT&T records, VIN 2C3CDZFJ6KH649648 was associated with IMSI 310170853892852.

8.    Accordingly, on or about January 18, 2023, the government re-submitted an affidavit (the "January 18, 2023 Affidavit) in support of an application for historical cell site information for the telematics system in the **Subject Vehicle** containing the same information as the March 5, 2021 Affidavit. On or about January 18, 2023, Magistrate Judge Jeffrey T. Gilbert granted the application and issued a search warrant for records regarding the **Subject Vehicle** with VIN, 2C3CDZFJ6KH649648 and/or IMSI 310170853892852 (the "January 18, 2023 Warrant and Order"). The January 18, 2023 Affidavit and the January 18, 2023 Warrant and Order are incorporated herein by reference and can be made available to the Court upon its request. Law enforcement re-served the January 18, 2023 Warrant and Order on AT&T on or about January 18, 2023.

9. On or about January 23, 2023, AT&T informed me that there were no records for the specific identifiers described in the January 18, 2023 Warrant and Order during the specified time period.

10. In conducting my investigation, I learned that, according to law enforcement records, the telematics system in the **Subject Vehicle** was replaced on January 16, 2021 so that it would be functional when returned to its owner (the **Subject Vehicle** was stolen in December 2020, as described below). Based on my training and experience and information provided by AT&T, I know that each vehicle telematics system has its own unique IMSI.

11. On or about January 23, 2023, I again spoke with representatives from AT&T. According to AT&T, it only stores the current IMSI for a vehicle or VIN and does not retain data for previous telematic system IMSIs that were associated with the vehicle or VIN. Therefore, I believe the IMSI provided by AT&T described in Paragraph 7 of this affidavit (IMSI 310170853892852), which was identified in the January 23, 2023 Warrant and Order was inaccurate, as that warrant and order identified the *current* telematics system identifiers of the **Subject Vehicle** (as it exists today), and not the prior IMSI associated with the telematics system in the Subject Vehicle as it existed at *the time of the commission of the **Subject Offenses***.

12. According to information provided by Fiat Chrysler Automotives, the IMEI 0151700079155346 was related to the **Subject Vehicle** during the time of the commission of the **Subject Offenses**. According to records provided by AT&T, IMEI

6

0151700079155346 was related to IMSI 310170825118863 and phone number or MSISDN 521-757-4569 from at least December 28, 2020, through January 16, 2021, i.e. at the time of the commission of the **Subject Offenses**.

13.     Therefore, I believe IMSI 310170825118863 and MSISDN 521-757-4569 are the correct identifiers required for AT&T (PROVIDER) to provide location information for the **Subject Vehicle** during the time period in which the **Subject Offenses** occurred. Accordingly, the government is re-submitting this application for historical cellular location information for the **Subject Vehicle** with updated identifiers to continue the investigation of the **Subject Offenses**.

### *The January 4, 2021, Bank Robberies*[3]

14.     According to eyewitness accounts and surveillance videos, on January 4, 2021, at approximately 1:45 p.m., at least one unknown male attempted to rob the PNC Bank located at 2810 South Highland, Lombard, Illinois. According to an eyewitness, the unknown male got into the passenger side door of a green 2-door Dodge vehicle (the **Subject Vehicle**). Another eyewitness provided law enforcement with a video of the parking lot outside of the PNC Bank at the time of the robbery, which shows the **Subject Vehicle**. A screenshot is below:

---

[3] According to records from the Federal Deposit Insurance Corporation the deposits of the Byline Bank, Fifth Third Bank, and PNC Bank were federally insured at the time of the **Subject Offenses**.



15.     According to eyewitness accounts and surveillance videos, less than an hour later, at approximately 2:40 p.m., at least two unknown males robbed the Byline Bank located at 3245 Lake Avenue, Wilmette, Illinois. According to an eyewitness, they noticed the **Subject Vehicle** was parked at an angle in front of the bank approximately two minutes prior to the robbery. When the robbers left, the eyewitness did not see where the robbers went but saw the **Subject Vehicle** leave the bank's parking lot shortly after. A surveillance camera captured the **Subject Vehicle** before, during, and after the robbery. A screenshot from that video is below:



16.     According to eyewitness accounts and surveillance videos, later that day, at approximately 4:17 p.m., at least two unknown males attempted to rob the Fifth Third Bank located at 1311 Ridgeland Avenue, Naperville, Illinois. According to an eyewitness, just before the robbery, they saw the **Subject Vehicle** back into a parking spot at the bank. The **Subject Vehicle** had the back license plate bent upwards. Just after the robbery occurred, the eyewitness saw the **Subject Vehicle** leave the bank's parking lot. About three minutes after the robbery started, at approximately 4:20 p.m., police officers responding to reports of the robbery observed the **Subject Vehicle** in the parking lot outside the bank. At this point, the **Subject Vehicle** took off in flight from the police. Although the police pursued the **Subject Vehicle**, they were unable to apprehend the **Subject Vehicle**'s occupants. Below is

a screenshot of police dashboard camera footage of the parking lot, which shows the **Subject Vehicle**:



*Identifying the Subject Vehicle*

17.     According to records from the National Insurance Crime Bureau (NICB), as of January 5, 2021, there was only one lime green Dodge Challenger stolen in the United States in the sixty days prior. That particular car, a lime green 2019 Dodge Challenger, was stolen in Lansing, Illinois on or about December 29, 2020.

18.     On or about January 8, 2021, law enforcement spoke with the stolen vehicle's owner. According to the owner, his/her green 2019 Dodge Challenger was stolen on December 29, 2020. According to surveillance video of the alley behind the owner's residence, on or about December 29, 2020, at approximately 2:59 a.m., an unknown hooded individual pushed the stolen car (the **Subject Vehicle**) down the dark alley with the assistance of a white or silver Chevrolet Malibu, which can be seen pressed against and pushing the car by its rear bumper.

10

19.     The owner of the stolen vehicle reviewed surveillance footage obtained from the three bank robberies on January 4, 2021, and told law enforcement that s/he believed the **Subject Vehicle** involved in the robberies was indeed his/her stolen Dodge Challenger based on, among other things, the **Subject Vehicle**'s size and location of a sticker and a scratch mark on the side of the **Subject Vehicle** which the owner recognized. The **Subject Vehicle**'s owner then provided law enforcement with consent to request the historical cellular location information for the **Subject Vehicle**.

### *Law Enforcement Recovers the Subject Vehicle*

20.     On the evening of January 8, 2021, after the FBI had put out a notification regarding the **Subject Vehicle**, police in Decatur, Illinois, saw, stopped, and seized the **Subject Vehicle**. A female individual was driving. The female driver initially told the police that the **Subject Vehicle** belonged to one of her clients who left the **Subject Vehicle** with her.

21.     The next day, FBI and Decatur law enforcement confronted the female driver about her explanation to Decatur Police the previous evening, noting that social media posts by her apparent boyfriend contradicted her account about the **Subject Vehicle**. The driver then admitted that she had lied about the **Subject Vehicle** the previous day and agreed to cooperate. She then put law enforcement enforcement in contact with her boyfriend, who she said was the **Subject Vehicle**'s "owner" (the "**Subject Vehicle**'s Purchaser" or the "Purchaser").

22.     On January 10, 2021, FBI and Decatur law enforcement confronted the **Subject Vehicle**'s Purchaser about the **Subject Vehicle** and he agreed to cooperate. The Purchaser explained that his friend told him that he could buy a car from an associate through an intermediary (the "**Subject Vehicle**'s Seller" or the "Seller").

23.     According to the Purchaser, on January 2, 2021—five days after the **Subject Vehicle** was stolen and two days before the January 4, 2021 bank robberies—the Seller called the Purchaser while he (the Purchaser) was in Atlanta with his girlfriend (the female driver from January 8, 2021) and offered to sell the **Subject Vehicle** to the Purchaser. The Purchaser and the Seller then negotiated the price of the car, and the Seller asked whether the Purchaser was serious about buying the **Subject Vehicle** from the Seller's associates. The Purchaser and the Seller eventually agreed on a price of $5,000, and they agreed to meet in Chicago on the evening of January 4, 2021—the eventual day of the bank robberies.

24.     According to the Purchaser, he and his girlfriend flew from Atlanta to St. Louis on January 4, 2021, then drove to Chicago to purchase the **Subject Vehicle**. They arrived late at night (after the bank robberies had already occurred). On arrival, the Seller instructed the Purchaser to meet at a McDonald's near 87th Street and Wabash Avenue in Chicago. When the Purchaser arrived, the Seller said that he had to call the "seller" to settle on a meeting point. The Purchaser described that the Seller kept changing the final meeting point, but eventually the Purchaser followed the Seller to a dark alley, where they waited for the **Subject Vehicle** to arrive. Soon, two

cars pulled into the alley: the **Subject Vehicle**, followed by a dark Chrysler. An unknown passenger exited the **Subject Vehicle** and entered the Chrysler, while the driver of the **Subject Vehicle** approached the Purchaser. When the driver asked for the money, the Purchaser went back to his girlfriend's car, retrieved $4,000 of the $5,000[4] he brought to buy the car, and gave it to the driver in exchange for the key fob. The Purchaser then drove the **Subject Vehicle** to Decatur.

25.     Accordingly, based on the above information, I believe the perpetrators of the **Subject Offenses** (the associates of the Seller and/or the Seller) stole the **Subject Vehicle** in Lansing, IL on or about December 29, 2020, used the **Subject Vehicle** as the getaway car to commit the **Subject Offenses**, then sold the **Subject Vehicle** in an illicit cash transaction to the Seller to dispose of the **Subject Vehicle**.

26.     Based on my training and experience, I believe that historical cellular location information related to the **Subject Vehicle**'s telematics system on the days leading up to, of, and after the January 4, 2021 bank robberies will likely constitute or lead to evidence of the **Subject Offenses.** The information could tell law enforcement where the vehicle was from the time it was stolen until the time it was sold to the **Subject Vehicle**'s Purchaser. Location information from the hours after the robbery may assist in identifying the robbers and their associates or co-conspirators. Indeed, robbers require a place to store, conceal, spend, or deposit cash or other valuable goods following a robbery. As such, location information for the

---

[4] The Purchaser intentionally shorted the Seller $1,000.

**Subject Vehicle** following the robberies may assist in identifying where robbery proceeds were stored, concealed, spent, or deposited.

### *Background Information Regarding Sirius XM*

27.    Based on my training and experience as well as the information provided to me by other law enforcement officers with whom I have consulted, I have learned Sirius XM is a provider of motor vehicle telematics services, which are described more fully below. Based on my review of publicly available information from Sirius XM, the **Subject Vehicle** is equipped with an operational telematics system provisioned by Sirius XM

28.    Based on my training and experience, I have learned that:

a.    A motor vehicle telematics system, such as the one provided by Sirius XM, is typically composed of a number of hardware and software components that support navigation and enable the connectivity of the vehicle. These components may include antennas, such as a Global Positioning System ("GPS") antenna, wireless technology such as a Bluetooth antenna for connection to the operator's cellphone, a WiFi antenna, and/or an embedded cellular connection (SIM card) for direct connectivity of the vehicle to the cellular networks, and electronics, including at least one computer, onboard a vehicle. These systems typically provide a variety of services to subscribers, such as providing navigational assistance and the ability to contact an operator and/or emergency services when assistance is needed. These systems are typically installed in the motor vehicles at the factory or at a dealership by the vehicle

14

manufacturer. After installation, vehicle owners or lessors sometimes pay a fee to a telematics service provider (often, the same company bearing the brand name of the telematics system), although free trials of such systems are sometimes offered in new vehicle purchases by some providers. Some vehicle manufacturers also include the telematics services as part of the purchase of the vehicle, without requiring a separate subscription fee to the telematics service provider.

      b.    Telematics systems, such as the one installed in the **Subject Vehicle**, typically have the ability to determine a vehicle's geographic location and transmit that location to the telematics company in order to facilitate the provision of services offered by the telematics provider. Telematics systems typically use GPS to determine a vehicle's geographic position when the vehicle is in operation. In addition, an embedded cellular connection enables a telematics provider to remotely collect vehicle performance information such as diagnostic data that may include location information.

      c.    Vehicle telematics systems, such as the one installed in the **Subject Vehicle**, may also include antennas and other equipment that allow the vehicles to send voice and data communications across cellular telephone networks. This capability allows vehicle operators to ask for help or information. It also permits the telematics service provider to contact the vehicle's telematics system remotely for various purposes, including to determine the vehicle's geographic location, to collect

15

diagnostic data, and to provide other services such as the ability to remotely unlock a vehicle's door, even when the vehicle is not in operation.

29. Based on my training, experience, and review of public information from Siruis XM, I believe that the telematics system believed to be present in the **Subject Vehicle** operates in a manner consistent with those systems described in paragraphs above. Based on records and information provided by AT&T, the **Subject Vehicle**'s telematics system uses AT&T wireless technology to communicate with Sirius XM.

30. Based on my training and experience, as well as information provided to me by law enforcement officers with whom I have consulted, wireless service providers such as AT&T commonly have the ability to provide information about the location of devices connected to their wireless network, including "cell site information" that is, records reflecting the cell tower and antenna face used by the **Subject Vehicle** at the start and end of communications with the network, as well as "Enhanced 911" (or "E-911") tools, such as GPS fixes, triangulation, cell-site "pings," received signal strength indicator (RSSI), and timing offset analysis (Doppler-type measurements), precision location information, and mobile locator information.

### *Historical Cell Site Information*

31. Based on my training and experience, historical cell site location information for the **Subject Vehicle** on the days leading up to, the day of, and the days after the January 4, 2021 robberies will likely constitute or lead to evidence of

the **Subject Offenses**. The information could tell law enforcement where the **Subject Vehicle** was from the time it was stolen in Lansing, during the robberies, and until the time it was recovered in Decatur. Location information from the hours prior to and after the robbery may assist in identifying the getaway driver and his or her co-conspirators.

32.    In my training and experience, I have learned that PROVIDER is a company that provides cellular telephone access to the general public, including telematics services within vehicles, as described above. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones or vehicles to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone or vehicle but is typically less precise than other types of location information, such as E-911 Phase II data or GPS data.

17

33.     Based on my training and experience, I know that PROVIDER can collect cell-site data about the **Subject Vehicle**'s telematics system. I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to vehicles to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

34.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*Shanna Saunders*

Shanna K. Saunders
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone on February 24, 2023

Gabriel A. Fuentes
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with a green 2019 Dodge Challenger with VIN 2C3CDZFJ6KH649648 (the "**Subject Vehicle**") and/or IMSI 310170825118863 and/or MSISDN 521-757-4569 and/or IMEI 0151700079155346, that are stored at premises controlled by AT&T ("PROVIDER"), headquartered at North Palm Beach, Florida.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

### I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period <u>December 29, 2020, at 12:00 a.m. Central Standard Time (CST), through January 8, 2021</u>:

    a. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

        ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received;

        iii. records containing timing advance measurements and distance to tower measurements for all technologies (CDMA, GSM, UMTS,

LTE, 5G, etc.), including Real Time Tool (or "RTT") data, Per Call Measurement Data (PCMD), "True Call" records, or any other proprietary name for such timing advance data; and

iv. any other available location information that contains latitude and longitude coordinates of a device, such as Location Database of Record (LOCDBOR).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 18, United States Code, Sections 2113(a) and 1951 during the time period <u>December 29, 2020, at 12:00 a.m. Central Standard Time (CST), through January 8, 2021</u>, including all information identified in Section I(a)(i) through (a)(iv).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.